```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT


JAMES BAKER,                       :

    Plaintiff,                     :

V.                                 :   CASE NO. 3:05-CV-548 (RNC)

JOHN TARASCIO et al.,              :

    Defendants.                    :
```

                            RULING AND ORDER

Plaintiff is one of a number of inmates who were assaulted by other inmates during a gang-related incident at Corrigan-Radgowski Correctional Center ("Corrigan"). As a result of the assault, he sustained two fractures of the orbital wall of his right eye and cuts on his hands. He brings this action pursuant to 42 U.S.C. § 1983 claiming that the defendants violated his rights under the Eighth Amendment, made applicable to the states through the Fourteenth Amendment, because they failed to take adequate protective measures in advance of the attack and failed to intervene to protect him once the attack began. Defendants have moved for summary judgment. Uncontested facts and videotape evidence conclusively establish that the defendants did not violate the plaintiff's constitutional rights. Accordingly, the motion for summary judgment is granted.[1]

---

[1] Plaintiff also claims that Saundra Katz-Feinberg, a former nurse at Corrigan who is now deceased, was deliberately indifferent to his medical needs following the assault. On August 24, 2006, a statement noting the death of Ms. Katz-
                                                        (continued...)

I. <u>Summary Judgment</u>

Under Federal Rule of Civil Procedure 56(c), summary judgment "should be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Summary judgment is a procedure for avoiding unnecessary trials on claims or defenses that are legally insufficient. The availability of summary judgment thus depends on whether the evidence raises a proper issue for trial. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). In determining whether the evidence raises a jury issue or is so one-sided that the moving party must prevail, the evidence must be viewed in a manner most favorable to the nonmoving party. <u>Id.</u> at 255. Evidence favorable to the

---

[1](...continued)
Feinberg was filed and served. Plaintiff failed to file a motion for substitution of her representative within 90 days, as required by Fed. R. Civ. P. 25(a). Plaintiff contends that he was not required to file a motion because the statement noting the death did not identify a representative who could be substituted. Rule 25(a)(1) "does not require that the statement identify the successor or legal representative; it merely requires that the statement of death be served on the involved parties." <u>Unicorn Tales, Inc. v. Banerjee</u>, 138 F.3d 467, 470 (2d Cir. 1998). Accordingly, the claim against this defendant is dismissed in accordance with Rule 25(a)(1).

I. <u>Summary Judgment</u>

Under Federal Rule of Civil Procedure 56(c), summary judgment "should be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Summary judgment is a procedure for avoiding unnecessary trials on claims or defenses that are legally insufficient. The availability of summary judgment thus depends on whether the evidence raises a proper issue for trial. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). In determining whether the evidence raises a jury issue or is so one-sided that the moving party must prevail, the evidence must be viewed in a manner most favorable to the nonmoving party. <u>Id.</u> at 255. Evidence favorable to the

---

[1](...continued)
Feinberg was filed and served. Plaintiff failed to file a motion for substitution of her representative within 90 days, as required by Fed. R. Civ. P. 25(a). Plaintiff contends that he was not required to file a motion because the statement noting the death did not identify a representative who could be substituted. Rule 25(a)(1) "does not require that the statement identify the successor or legal representative; it merely requires that the statement of death be served on the involved parties." <u>Unicorn Tales, Inc. v. Banerjee</u>, 138 F.3d 467, 470 (2d Cir. 1998). Accordingly, the claim against this defendant is dismissed in accordance with Rule 25(a)(1).

nonmoving party is to be credited if a reasonable jury could credit it. Other evidence is to be disregarded unless a jury would have to accept it as true. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000)(discussing identical standard under Fed. R. Civ. P. 50).

II. Background

The Department of Correction designates inmate groups that pose a threat to the safety of staff or other inmates as Security Risk Groups ("SRGs"). Plaintiff was designated as a member of the SRG known as the "Bloods." During the period of time relevant to this lawsuit, he and approximately six other Bloods resided in a "close monitoring unit" at Corrigan known as "E-pod," along with approximately ninety-three other inmates, some of whom were members of other SRGs.

On July 17, 2003, an inmate informed defendant Kris Korch, a correction counselor at Corrigan, that members of the Latin Kings, Los Solidos, and Neta (all SRGs) planned to attack members of the Bloods in E-pod on July 20. Korch relayed this information to defendant Verdone, an experienced correction officer at Corrigan. After interviewing Korch, Verdone consulted with other supervisory staff. In short order, E-pod was placed on lock-down status to prevent inmates from leaving their cells. A "shake down" was conducted of every cell in the unit. No dangerous contraband or weapons were found. The telephones in E-

pod were monitored.  No information was obtained indicating that inmates were involved in planning an attack.  In addition every inmate in the unit was interviewed concerning the potential attack, including the plaintiff.  Inmates who had cooperated with Verdone in the past told him that they knew nothing about an attack but would let him know if they heard anything.

Based on the results of the investigation, Verdone concluded that if there was a conspiracy to attack the Bloods in E-pod, it did not have enough support to be successful.  Nevertheless, supervisory staff decided to remove from the unit the respective "presidents" of the Latin Kings, Los Solidos, and Neta, as well as another inmate who had recently transferred into the unit and was suspected of being a trouble maker.  These four inmates were interviewed further.  None provided any information concerning a planned attack.  E-pod was taken off lock-down status on July 21 at 4:00 p.m.[2]

The next morning, plaintiff was attacked by a number of other inmates while using a telephone in a common area of E-pod.  Other members of the Bloods in E-pod also were attacked at or about the same time.  Plaintiff alleges that defendants Schoonmaker and Vergason, both correction officers, had

---

[2] Defendants assert, and plaintiff admits, that maintaining a unit on lock-down status for an extended period can increase security risks.  For this reason, the strategy of placing a unit on lock-down status is used sparingly and for as short a duration as possible.

4

unobstructed views of the attack on him and did nothing to help. He acknowledges that the attack was stopped by defendant Verdone, who sprayed mace on one of his attackers, an inmate named Diaz. He also concedes that, at some point after the fights broke out, a "Code Blue" was called, summoning all available officers to E-pod, and that these additional officers arrived around five minutes after the beginning of the attack. He alleges, however, that the response to the attack was so slow as to evince deliberate indifference to his safety.

    The pertinent events were filmed by three surveillance cameras located at several different places in E-pod. None of the three videotapes taken from these cameras is sufficient by itself to provide a clear picture of exactly what occurred. But careful review of these three tapes plus a fourth tape taken from a hand-held camera reveals that there were two fights in the common area of E-pod that morning, both of which broke out at about 9:41:07 a.m. One fight, involving two inmates, broke out by a control desk located in the middle of the common area. Correction officers broke up this fight by 9:41:41. The second fight, involving at least four inmates, began near a pay telephone located away from the control desk near a wall. Two correction officers intervened in this fight by approximately 9:41:12, not more than about five seconds after it began. It took some time to disperse the combatants but the fight was

5

broken up by 9:41:48.  There were no other fights in the common area where plaintiff was attacked besides these two fights shown on the videotapes taken from the surveillance cameras. Consistent with plaintiff's own testimony, therefore, a reasonable jury would have to find that he was involved in the fight that began at the telephone.[3]

III. Discussion

    A.   Failure to Take Protective Measures

Prison officials have a duty to take reasonable measures to protect an inmate from violence by other inmates; failure to do so may constitute cruel and unusual punishment.  Ayers v. Coughlin, 780 F.2d 205, 209 (2d Cir. 1985).  To establish an Eighth Amendment violation, a prisoner must show that (1) the conditions of his incarceration posed a substantial risk of serious harm and (2) prison officials were deliberately indifferent to the risk.  See Farmer v. Brennan, 511 U.S. 825, 834 (1994); Hayes v. N.Y. City Dept. of Corrections, 84 F.3d 614, 620 (2d Cir. 1996).  A prison official displays deliberate indifference when he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw

---

[3] The hand-held videotape suggests that other fights may have occurred inside some of the cells in E-pod.

6

the inference." Farmer, 511 U.S. at 837.  A prison official who is aware of an excessive risk is not liable if he or she "responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.

Viewing the evidence in a manner most favorable to the plaintiff, a reasonable jury could not find that any of the defendants disregarded an excessive risk to his safety.  The uncontested facts establish that the defendants responded reasonably to Korch's information about a potential gang-related attack on the Bloods in E-pod by imposing a lock-down, conducting an investigation and transferring inmates.  The lock-down was lifted only after the defendants were satisfied that there was no serious threat.

Plaintiff contends that the defendants were aware of a specific threat against him and were required to do more to protect him.  Because plaintiff is not the only one who was attacked, it seems unlikely that there was a specific threat against him.  He offers no evidence that there was such a threat other than an affidavit provided by an inmate named Smith, who attests that defendant Nordstrom asked him if he knew of a specific threat against the plaintiff and Smith said no.  Viewing the Smith affidavit in a manner most favorable to the plaintiff, and resolving all ambiguities in his favor, perhaps a jury could reasonably infer that Nordstrom was particularly concerned about

7

the risk of an attack on the plaintiff.  Giving plaintiff the benefit of this inference, it does not follow that Nordstrom or any of the defendants consciously ignored an excessive risk to plaintiff's safety.  The Smith affidavit itself shows that they were investigating the potential risk.

Plaintiff contends that because the defendants were aware of a specific threat against him, they were required to warn him and their failure to do so evinces deliberate indifference.  He also suggests that a finding of deliberate indifference is supported by the facts that staff-levels were not increased in E-pod on the day of the attack and that only three leaders of the rival SRGs were removed and inmate Diaz was allowed to stay.  With respect to the failure to warn plaintiff specifically, it is undisputed that plaintiff was informed of the risk of a possible gang-related attack against the members of his group in E-pod.  He does not specify what additional warning was required or explain what it would have accomplished.  More generally, plaintiff does not suggest that the defendants' conclusion, formed after careful investigation, that the threat was insubstantial was in error.  There is nothing in the record to suggest that, two days after the planned date of the attack, after the unit was put on lock-down, after defendants' investigation turned up no evidence that a significant attack was likely, the defendants still thought that plaintiff and the other Bloods were at a substantial risk of

8

harm and were deliberately indifferent to that risk.  Given the uncontested facts regarding the protective measures that were taken, plaintiff's bare assertion that some additional measures should have been taken is insufficient to support a finding that any of the defendants was deliberately indifferent.

    B.    <u>Failure to Intervene</u>

Allowing an attack on an inmate to proceed without intervening is a constitutional violation in certain circumstances.  See <u>Davidson v. Cannon</u>, 474 U.S. 344, 347-48 (1986); <u>Morales v. New York State Department of Corrections</u>, 842 F.2d 27, 30 (2d Cir. 1988).  The standard of culpability that must be proven to sustain an Eighth Amendment claim is deliberate indifference.  <u>Williams v. Vincent</u>, 508 F.2d 541, 546 (2d Cir. 1974).  An officer displays deliberate indifference when he has adequate time to assess a serious threat against an inmate and a fair opportunity to protect the inmate without risk to himself, yet fails to intervene.  <u>Stubbs v. Dudley</u>, 849 F.2d 83, 86-87 (2d Cir. 1988).

Though plaintiff alleges that the attack on him began at least five minutes before the officers responding to the Code Blue entered E-pod, and seems to contend that no one intervened during this time, the videotape evidence belies his claim. See <u>Scott v. Harris</u>, 550 U.S. 372, 127 S.Ct. 1769, 1776 (2007) ("When opposing parties tell two different stories, one of which

9

is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). As discussed above, the videotapes establish that officers swiftly and competently broke up both fights in the common area of E-pod. Plaintiff has never alleged that there was a third fight that was not caught on tape.[4]

IV. Conclusion

For the foregoing reasons, defendants' motion for summary judgment is hereby granted. The Clerk may close the file.

So ordered this 6th day of March 2009.

/s/ RNC
Robert N. Chatigny
United States District Judge

---

[4] In his opposition to the defendants' motion, plaintiff notes that he is not alleging that all correction officers failed to intervene, only Vergason, Korch, Schoonmaker and Verdone. He suggests that "[a]ctions by any other staff members are irrelevant to the plaintiff's claims against these four custodial defendants." (Pl.'s Mem. Opp. S.J. 16). This is certainly mistaken. If other officers besides these four immediately and adequately intervened to break up the fight, as the videotapes show they did, there was no constitutional violation.